MINNIE McMAINS, Appellant, v. VIOLA M. TULLIS et al., Appellees.

No. 41014.

MARCH 8, 1932.

W. H. Keating and Devitt, Eichhorn & Devitt, for appellees.

MORLING, J.—William H. Tullis was the owner of a farm of 56½ acres on which he and his wife Annie and his daughter, the defendant Viola, had their home. Viola never married. W. H. Tullis and his wife appear to have had trouble between

themselves, the extent and nature of which do not appear, further than that plaintiff's witness Armstrong testifies:

"Every time he would come around she was nagging him. He couldn't stay at home in peace. He wanted her to take care of Viola, and he had to get money. They made it up that they would deed it over to her, to Viola. He took this $1500." (The $1500 loaned by witness to Viola on mortgage later referred to.) The witness says, "He (W. H. Tullis) wanted to get away."

Under date of September 5, 1905, W. H. Tullis and his wife Annie executed to Viola a warranty deed for the 56½ acres for the expressed consideration of $1500. On the same day Viola executed to Armstrong her note secured by mortgage on the farm for $1500. W. H. Tullis went away and later returned. On March 18, 1907, W. H. Tullis obtained in the Mahaska District Court a decree of divorce from Annie Tullis, which recited: "Plaintiff's interest in real estate on which defendant is living, live stock and implements thereon and household goods set off to the defendant as her own." This decree was offered in evidence over defendant's objection. The evidence tends to show that $1100 of the mortgage to Armstrong was paid by W. H. Tullis and $400 by Viola and her mother. Viola on July 26, 1911, executed to William H. Tullis her note for $1100 secured by mortgage on the land. W. H. Tullis died October 13, 1915. Under date of November 18, 1915, three surviving children of William H. Tullis, including plaintiff, and two surviving children of a deceased son "in consideration of full satisfaction" of the $1100 note and mortgage executed an assignment of it to Viola. These instruments were all recorded. The deed and Armstrong mortgage were recorded on the date of their execution. Plaintiff's then husband was then recorder, and plaintiff was fully informed of the deed and mortgages. On November 8, 1923, Viola executed a mortgage for $4,000 on the land, which was released March 2, 1928. Viola and her mother lived on the land until about 1924. On March 29, 1929, Viola, having exchanged the land in 1925, executed a deed to the purchaser. Annie died October 12, 1929. The proceeds of the land, directly or indirectly, in whole or in part, are represented by three city lots which have been acquired by Viola and which are subject to this suit. The conveyances of the lots were

to Viola, one of them subject to a mortgage of $1,000, which Viola assumed. The petition in this suit was filed June 3, 1930. The only defendants are Viola and Harry, a brother. The other heirs of William H. Tullis and wife are not parties. Petition alleges that plaintiff, Viola, and Harry are the children of Annie; that prior to the death of Annie, Annie, Viola, and Harry colluded to secure possession and deed to the farm, "claiming to hold the same in trust for said deceased (Annie), and * * * exchanged said farm for the" town lots referred to, "which property was held in trust under the same condition and in place of said farm"; that "both the deceased and the said defendants herein named expressly stated that the said property was held in trust for Annie Tullis and the plaintiff and the heirs at law of the said Annie Tullis"; that Viola has refused to recognize plaintiff as an heir at law with distributive share in the property; that there are five heirs at law and plaintiff is entitled to one-fifth interest. The prayer is that the "plaintiff's distributive share be established in and to said real estate and that said real estate be sold and the plaintiff receive her distributive share," etc. Harry answered denying any interest. Viola filed general denial and plea of absolute ownership, adverse possession, and laches.

On the day before the trial plaintiff amended, alleging that deed to the farm was obtained by fraud and deceit of defendants, in that the father and mother were having domestic troubles, and in order to preserve the interests of the children, with the consent of the children, placed the title to the farm in the name of the defendants "in a trust, under the oral promise and agreement of said defendants that each of said heirs, including the plaintiff, would receive their one-fifth interest, upon the death of both of said grantors, and did thereupon make the said oral agreement a precedent condition to the delivery of said deed, and said deed thereby never became legally delivered, and that said condition has not been performed * * * that said defendants and each of them orally agreed and orally promised to hold the title to said property and permit the father and mother to have the income therefrom during their lifetime, and, upon the last becoming deceased, * * * the said property should be divided equally among the five heirs. * * * That the plaintiff believed and relied upon the said defendants * * * as to their

promises to hold said property in trust * * *'' The prayer of the amendment was ''as in her original petition, that the said deed to said properties * * * be set aside * * * in so far as the plaintiff's one-fifth interest is concerned therein * * *'' By another count in the amendment plaintiff alleged ''that as a part of said scheme to defraud,'' Viola executed the mortgage and note of July 26, 1911, to William H. Tullis and secured through the aforesaid promises an assignment of the mortgage. The prayer of this count was that the assignment be set aside, and that plaintiff have her one-fifth interest in the real estate and that an accounting be had. On December 16, 1930, plaintiff replied with a general denial, and affirmative allegation that defendant secured possession of the property as alleged in the petition and amendment, ''and at all times held the same in trust for said plaintiff, save and except sufficient of the income to aid in the support of said William H. Tullis and Annie Tullis,'' and the statute of limitations did not commence to run until the death of Annie. The trial commenced December 16, 1930. On December 22, 1930, plaintiff again amended, in order to ''more particularly conform to the evidence'' (which, as will be seen, principally was the testimony of the plaintiff herself), alleging that there was no consideration for the deed of 1905; that the deed was executed as a mortgage for the purpose of securing a loan made to William H. Tullis for $1500, which was later paid off by William H. Tullis and Annie Tullis, ''and the said Annie Tullis was in possession of said farm * * * until 1925 and used the rents and profits of said farm for the upkeep of the same and for her support, and did, after said mortgage was paid, orally demand during her lifetime the return and cancellation of said warranty deed, and that in 1907, when said divorce was granted * * * said real property (the farm) * * * was re-established thereby in the said Annie Tullis; and that the said Viola M. Tullis had personal knowledge thereof and made no objection, and said warranty deed was in fact cancelled and thereafter forever a nullity * * *.''

No question of defect of parties is raised. Proper and timely objections such as incompetency of the plaintiff as a witness under the dead man's statute, the statute of frauds, hearsay, variation of written contract, conclusion, etc., were made by defendant to the plaintiff's offers of evidence.

Minnie Love testified to a conversation with Viola after the father's death. Witness says: "She (Viola) told me that she intended to give Minnie (plaintiff) her share. We were talking about settling up affairs, and she told me that Minnie would get—that she intended to see that Minnie got her share."

The purchaser of the farm testified that its value at the time he made the exchange was $10,000. Plaintiff testified that her father and mother were "divorced in 1905. * * * My father wasn't satisfied at our place and he made several trips but I can't remember just when * * * After the divorce was granted he went west;" that prior to the execution of the deed by the father to Viola at which "my father, sister, my eldest daughter, and myself were present * * * I took no part in the conversation. I listened and knew what was said. My father wanted me to understand that this deed that was being transferred was only in trust, that he didn't want to wrong any of us. * * * He wanted her to hold that in trust for we children. * *, * Q. * * * What did she say to your father and what did your father say to her, as nearly as you can state? * * * A. I don't know how to tell you, it was only that he gave that to her to hold for us so mother wouldn't have it, but we would. He was going to protect we children. * * * She said, 'I will see that that is O.K.'" Plaintiff testified that she had a conversation with Viola after that. "She said, 'You don't need to worry, it is not mine, it is mother's. You will get your share.'" That Viola at other times made the same statements; that prior to the execution of the assignment of the mortgage Viola "said that it would never be effective. The mortgage was to be of no effect. She said I would receive my share in the property." That in a conversation that the mother had with Viola after the divorce, "Mother said that she wanted—that it was hers and that she wanted—she said if it was deeded at all she would deed it to Harry, she was only holding it so we would all get what she had promised to do for us. * * * Q. Was that what Viola M. Tullis said to your mother? Mr. Devitt: Same objection. A. Viola wasn't there at the time. Mother and I and my daughter was there at that time." That plaintiff afterwards took up the matter with Viola and related what the mother said; that Viola "said that she was holding it for us as she agreed to do, and she was going to do it, and we should have our share as she had

agreed to, after he gave it to us. * * * She said she wouldn't deed it away. She had it and she was going to keep it and see that we got it." That after the father's death plaintiff heard a conversation between Viola and the mother in which the mother said, "She wanted her rights. * * * She said she wanted what was hers, and that farm was hers; it was her home." That Viola "said she was going to hold it."

Relative to the assignment of the mortgage plaintiff testified that Viola "wanted me to sign that, so she would get it in shape to deed back to mother. That was the reason it was signed." That it would not affect in the least plaintiff in receiving her share.

Plaintiff's first husband died. Her present husband testified that at a conversation between him and Viola, Viola said that plaintiff was going to get her share. Viola testified that she paid her father $1500 for the farm, took possession, lived on it, rented part of it, paid taxes, made improvements, occupied and controlled the property from 1905 to 1924; that she had at all times claimed to be the absolute owner down to the time she sold it, and was "in the sole control, management and custody of the property during that time, and have made all the improvements that were made on it. * * * Whatever property I took in exchange I took in my own name, and recorded the deed in my own name. I have exercised control over that property down to the present time, have lived in it, and have asserted during that time my absolute ownership of the property." She denied the conversations which Miss Love, plaintiff, and her husband claimed to have had with her. Viola testified that "up to the time of mother's death she made her home with me, and I took care of her, and I buried her."

The other heirs gave no testimony. Plaintiff's daughter was not a witness. The testimony is lengthy and the foregoing is merely an outline.

It will be seen that plaintiff's contentions in her petition and amendments and in her testimony are inconsistent and self-contradictory. Much of plaintiff's testimony is a manifest attempt to evade, and is inadmissible under, the dead man's statute. In re Estate of Runnells, 203 Iowa 144; In re Estate of Newson, 206 Iowa 514.

The burden of proof is upon the plaintiff. The defendant

1366

was in the possession and enjoyment of the farm under an absolute warranty deed to her, executed by both the father and mother, for substantially twenty years. She mortgaged it, sold and conveyed it as her own. The plaintiff was fully aware of Viola's dealing with the property. Plaintiff herself joined in the assignment to Viola of the mortgage which was given to the father. The recital in the decree of divorce was, as to defendant, who was not a party to it, even if definite, not binding on her.

An express trust in real property cannot be proved by parol. An implied or constructive trust may be established only on clear, convincing, and satisfactory evidence. Kelley v. Kelley, 189 Iowa 311; Willis v. Robertson, 121 Iowa 380; Jacobson v. Nealand, 122 Iowa 372; Butler v. Butler, 151 Iowa 583; Wagner v. Wagner, 208 Iowa 1004; Irving v. Grimes, 208 Iowa 298; In re Moore's Estate, 211 Iowa 804.

Plaintiff contends that defendants' admissions are competent to establish the trust. Neilly v. Hennessey, 208 Iowa 1338; Andrew v. State Bank of Blairsburg, 209 Iowa 1149.

Her evidence is far from establishing the alleged admissions. The allegations of non-delivery of the deed, conditional delivery, execution as security, cancellation, fraud, are without support in the evidence. Within the authorities the District Court was right in dismissing the plaintiff's petition.—Affirmed.

Evans, De Graff, Kindig, and Grimm, JJ., concur.

Wagner, C. J., not participating.